**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PATRICIA ENGLISH and** | : |
| **RICHARD ENGLISH, her husband,** | : |
| **Plaintiffs** | **CIVIL ACTION NO. 3:13-0978** |
| | : |
| **v** | : **(JUDGE MANNION)** |
| **CROWN EQUIPMENT** | : |
| **CORPORATION,** | : |
| **Defendant** | : |

## MEMORANDUM

Presently before the court in this products liability action is the motion for summary judgment filed by defendant Crown Equipment Corporation ("Crown") on plaintiffs' claims for strict liability and negligence. (Doc. 41). Also pending is Crown's motion to exclude plaintiffs' engineering expert Harold A. Schwartz, P.E. (Doc. 39). For the following reasons, the summary judgment motion is **GRANTED IN PART** and **DENIED IN PART**. The motion to exclude the testimony of plaintiffs' expert is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

This is a strict liability and negligence action arising from an incident in which plaintiff Patricia English was injured at work on April 18, 2011. Plaintiff was employed as a laborer for Wal-Mart in Pottsville, Pennsylvania when she was injured while operating a stock picker machine allegedly caused by a

malfunction in the machine. Plaintiff alleges that while she was operating the stock picker machine manufactured by Crown and sold to Wal-Mart, the machine turned off and came to an abrupt stop forcing her to go forward and then back, causing her body to twist. The steering wheel then allegedly fell off of the machine onto plaintiff's right knee and foot. As a result, plaintiff alleges that she sustained serious bodily injuries, including a right knee sprain, a medial meniscus tear of the right knee, injuries to her back, as well as bruises to her body. Plaintiff alleges that prior to her accident, Crown knew or should have known that its stock picker machines were defective and unreasonably dangerous. Specifically, plaintiff alleges that Crown should have known that the design and manufacture of the stock picker machine demonstrated a foreseeable and unreasonable risk of harm resulting in an increased likelihood of serious injury or death.

Plaintiff and her husband, Richard English, commenced this action against Crown on April 17, 2013. (Doc. 1). Plaintiffs' complaint contains three counts, negligence, strict liability and loss of consortium for Mr. English. First, plaintiff alleges that Crown "carelessly and negligently designed, planned, engineered, constructed, built, inspected, tested, manufactured, assembled, advertised, marketed and sold the stock picker machine and failed to include necessary safety features that would prevent the machine from jerking and causing the steering wheel to fall off the machinery so as to provide the occupant protection from such an accident." Secondly, plaintiff alleges that

"the stock picker machine was defectively designed, manufactured, tested, assembled, planned, engineered, constructed, built, inspected, marketed, distributed and sold." Plaintiff also alleges that the defective condition rendered the subject stock picker unreasonably safe to her, and that the defective design and insufficient instructions were substantial factors in causing her harm. Plaintiff further alleges that Crown failed to adequately warn and instruct of the potential risk of its stock picker machine, and failed to provide sufficient and proper written warnings affixed to the machine that would have alerted the consumer to the dangers posed by the machine's propensity for jerking and the steering wheel to fall off. Plaintiff alleges that the lack of sufficient instructions and warnings caused her injuries. Thus, plaintiff asserts strict liability claims against Crown based on theories of design defect, manufacturing defect and failure to warn.

On July 22, 2013, Crown filed an answer to plaintiffs' complaint and affirmative defenses. (Doc. 5). Crown denied all liability and denied that the stock picker machine was defectively manufactured, had a defective product design or failed to warn of any dangers. In its affirmative defenses, Crown alleged that Mrs. English was comparatively negligent and that her negligence was greater than that of Crown. Crown also asserts that plaintiff misused the machine, and that she assumed the risks and was aware of the alleged defects in the machine. Further, Crown avers that the stock picker machine was not negligently manufactured, designed or labeled.

Discovery then ensued and several extensions of time were granted. After discovery was completed, Crown filed its summary judgment motion with respect to all of plaintiffs' claims, pursuant to Fed.R.Civ.P. 56, on December 14, 2015. (Doc. 41). Crown simultaneously filed its statement of material facts and its brief in support. (Doc. 42, Doc. 43). Also, on December 14, 2015, Crown filed a motion to exclude plaintiffs' expert engineer Harold A. Schwartz, P.E., and a brief in support. (Doc. 39, Doc. 40). Exhibits were also filed with Crown's brief, including, a copy of Schwartz's deposition excerpts, his Expert Report, and his Supplemental Expert Report. (Doc. 40-2 to Doc. 40-12). On December 24, 2015, plaintiffs filed a motion for an extension of time to respond to both of Crown's motions, Doc. 44), and it was granted, (Doc. 45). Plaintiffs' filed their briefs in opposition to Crown's motions on January 18, 2016. (Doc. 48, Doc. 49). Both of plaintiff's briefs have attached exhibits, including Schwartz's Reports and his complete November 16, 2015 deposition transcript. (Doc. 48-1, Doc. 48-2, Doc. 48-3). Crown's reply briefs were filed on February 1, 2016. (Doc. 50, Doc. 51). Crown also attached additional portions of Schwartz's deposition. (Doc. 51-1).

Moreover, Crown requested oral argument with respect to both of its motions. The court has reviewed the filings of the parties as well as the record and finds, in its discretion, there is not a need for oral argument.

## II.    MATERIAL FACTS[1]

There were 5 Crown stock pickers, model 30SP48TT-330 ("SP48"), at the Pottsville Wal-Mart facility and, they were used by the Quality Assurance Department for verification of inventory. The SP48 stock pickers were manufactured by Crown since 1982. (Ronald Grisez, Director of Safety for Crown, Doc. 40-9). On April 18, 2011, plaintiff was operating one of the Crown SP48 stock picker machine during her employment with Wal-Mart, namely, stock picker number 201. Crown manufactured SP48 stock picker number 201 in January 2006 and Wal-Mart purchased it on March 21, 2006. (Doc. 40-2, Doc. 40-3). After delivery from Crown, Wal-Mart was responsible for the care and planned maintenance of the stock pickers. When Wal-Mart was not able to keep up with the maintenance requirements, Lift, Inc., a Crown independent dealer, would be utilized. (Doc. 40-9). An invoice from Crown for work performed by Lift on stock picker number 201 indicated that on March 16, 2011, the steering cable was replaced. (Doc. 40-9, at 8). Grisez testified that the steering wheel did not have to be removed in order to complete the replacement of the steering cable.

In her deposition, (Doc. 40-4, Doc. 40-9, at 5-6), plaintiff testified that on April 17, 2011, she did a pre-operation check list on stock picker number 201 and went to work. At the end of her shift, the stock picker would only back up

---

[1]The facts are derived from Crown's statement of material facts and the plaintiffs' response to it as well as the exhibits.

and definitely had a problem. Thus, plaintiff went to management and then to maintenance notifying them of the problems. She then took stock picker 201 to maintenance and went home. On April 18, plaintiff returned to Wal-Mart for work. When she arrived in the afternoon, she was told that Crown came on Monday while she was not there and serviced stock picker 201. She did not recall speaking to any Crown mechanics. Specifically, plaintiff stated that she was told by the Wal-Mart Manager of Quality Assurance, Denise (last name unknown), that Crown service personnel were at Wal-Mart and "they took the machine apart and put it back together and there was nothing wrong [with] the machine." Plaintiff further stated that Tori (last name unknown), the Wal-Mart, OPS manager for maintenance, also told her that "Crown was there today with him and that the machine was perfectly fine." (Id.). She then took stock picker number 201 to perform her work since the others were locked out.

Prior to operating stock picker number 201 on April 18, plaintiff performed her pre-operation inspection and checklist at the beginning of her shift and she noted no mechanical or functional problems. (Doc.40-4, at 2). During operation, she always had her left hand on the steering wheel and her right hand on the throttle. On the day in question, she did not feel the steering wheel getting looser as she operated stock picker number 201. Nor did the knob on the steering wheel get looser. Plaintiff states that the pedal on the floor of the machine was for braking and that she stood on it until she wanted to stop. When she was stopping, she lifted her foot off of the pedal. Plaintiff

6

testified that she operated the stock picker for 4 hours with a 15 minute break and had no problems with the machine and no sign of developing problems. At the time of the accident, plaintiff was at floor level pulling the basket, turning, entering right in front of the wrap machine, and then making a U turn to the left. When she came out of the turn going slowly, the 15-pound steering wheel on the stock picker came off in her hand and fell hitting her on the knee, foot and ankle. When the steering wheel came off in her hand, plaintiff fell backward and the stock picker simultaneously bucked and she went forward and then backward. Plaintiff stated that when the machine came to an abrupt stop, it caused her body to twist and jerk. As a result of the accident, she sustained injuries, including a meniscus tear to her right knee and injuries to her spine.

Subsequently, Wal-Mart conducted an investigation into plaintiff's accident and completed a Manager's Investigation of Event/Accident Report. (Doc. 40-6). The investigation found that the steering wheel fell off the stock picker while plaintiff was turning out of NN aisle in the store onto the dock and that plaintiff's foot slid from the emergency stop pedal causing the stock picker to stop abruptly. Plaintiff fell backwards into the stock picker basket, striking her head on the basket and twisting her right knee during the fall. The Report had a section stating "Name the object or substance that directly injured the associate." The Report stated that "the stock picker 201 steering wheel fell off the bolt and caused the associate to lose balance, resulting in

her foot slipping from the emergency stop pedal." The Report also stated: "Unsafe conditions: yes. If yes explain. The steering wheel fell off the bolt." The Report further had a section entitled "What actions have been or should be taken to prevent a similar Event/Accident?" and concluded: "The stock picker was serviced during the normal "PM" schedule and the steering wheel was intact at this time. The associate's (sic) using this piece of equipment did not notice a loose steering wheel or signs of a loose steering wheel prior to this incident." The Report indicated that "associates are being reminded to closely inspect their equipment prior to use and take any questionable equipment to the Maintenance Shop immediately."

Crown found 2 other instances of the steering wheel coming off an SP48 stock picker at different locations but there were no other instances where the SP48 stopped abruptly. (Doc. 40-9, at 8).

Plaintiff alleges that stock picker number 201 had a manufacturing defect, a design defect, and that Crown failed to provide warnings with its machine. Specifically, plaintiff alleges defects in the design of the stock picker's steering wheel fastening system and, in the design of the machine's electrical drive and hydraulic systems.

## III.    STANDARDS OF REVIEW

### A. Summary Judgment

Crown's motion for summary judgment is brought pursuant to the

provisions of Fed.R.Civ.P. 56. Crown argues that under Rule 56, the undisputed material facts demonstrate that it is entitled to summary judgment with respect to all of the counts of plaintiffs' complaint.

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively

identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). The nonmoving party "may not rest on the allegations set forth in its pleadings but must counter with evidence that demonstrates a genuine issue of fact." Big Apple BMW, 974 F.2d at 1363. However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

Additionally, a "party cannot rely upon self-serving conclusions, unsupported by specific facts in the record." LaResca v. AT&T, 161

F.Supp.2d 323, 327 (D.N.J. 2001) (citing Celotex, 477 U.S. at 322–23, 106 S.Ct. 2548).

### B. Motion To Exclude Expert

Crown's motion to exclude the testimony of plaintiffs' expert seeks, in part, to exclude evidence as irrelevant. It is axiomatic that "irrelevant evidence is not admissible." Fed.R.Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and if "the fact is of consequence in determining the action." Fed.R.Evid. 401. Even if evidence is relevant, the court can exclude it if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed.R.Evid. 403.

The motion also seeks to exclude expert testimony from Mr. Schwartz at trial. The admissibility of expert testimony is governed by under FRE 702, which requires an expert witness to have "specialized knowledge" regarding the area of testimony. The Third Circuit has explained, "[t]he basis of this specialized knowledge can be practical experience as well as academic training and credentials," and "[w]e have interpreted the specialized knowledge requirement liberally." Betterbox Commc'ns Ltd. v. BB Techs., Inc., 300 F.3d 325, 327-28 (3d Cir. 2002) (internal citations omitted). The Federal

Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact. Id. Moreover, Rule 702 "has a liberal policy of admissibility." Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997) .

When faced with a proffer of expert testimony, the court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 592. The *Daubert* Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id., at 597. The test of reliability is "flexible," and *Daubert*'s list of specific factors - testing, peer review, error rates, and "acceptability" in the relevant scientific community -  neither necessarily nor exclusively applies to all experts or in every case. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).

In performing its gatekeeping function to determine whether an expert's report is relevant and reliable under *Daubert* and Rule 702, "the court is not to weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein. . . . Determinations regarding the weight to be accorded, and the sufficiency of, the evidence relied upon by the proffered expert are within the sole province of the jury." Walker v. Gordon, 46 F. App'x 691, 695 (3d Cir. 2002) (citing Breidor v. Sears, Roebuck & Co., 722 F.2d

1134, 1138-39 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge.")).

Additionally, experts can provide an opinion about the ultimate issue in a case, but may not give an opinion tied to any legal conclusion, such as whether a defendant was negligent. Patrick v. Moorman, 536 Fed. App'x 255, 258 (3d Cir. 2013)(citing Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006); United States v. Leo, 941 F.2d 181, 196–97 (3d Cir. 1991)).

## IV.    DISCUSSION

### A. Crown's Motion to Exclude Schwartz's Testimony and Reports

Crown contends that there is no admissible expert evidence in the record that it designed the SP48 stock picker machine defectively and bases its summary judgment motion on its belief that its motion to exclude the testimony of plaintiffs' expert, Schwartz, will be granted. As such, the court must first address Crown's *Daubert*[2] motion to preclude plaintiffs' liability expert, Schwartz, from testifying since this motion will determine what evidence will be considered with respect to Crown's summary judgment motion.

---

[2]*See* Daubert v. Merell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786 (1993).

As this case proceeded toward trial, the plaintiff commissioned an expert report and supplemental report from Schwartz, a professional engineer. (Doc. 40-9, Doc. 40-10). Schwartz is plaintiff's only liability expert. He proffers three opinions regarding the design of the stock picker machine. He first opines that Crown was responsible for plaintiff's accident because of the defective design with the SP48 for securing the steering wheel to the steering shaft. Specifically, Schwartz opines that the stock picker machine's steering wheel should have been secured to the steering shaft by a through bolt and safety wire or a through bolt and cotter pin, as opposed to a retaining bolt and lock washer. (Doc. 40-9, at 9). Schwartz stated that when the stock picker was traveling straight, the steering wheel retaining bolt would be hanging with its head down and had no retainer to keep the bolt from backing out. Schwartz opined that this fastening system was constantly subjected to the vibration of the stock picker in operation and, that this method of fastening the steering wheel to the steering shaft was "a poor design because the bolt is hanging down while being constantly subjected to vibration and frequent torque reversal which could easily loosen the bolt and gravity would cause the bolt to unscrew and eventually fall from its proper installed location." (Doc. 40-9, at 9).

Grisez, Crown's expert, indicated that the steering wheels on the SP48 stock pickers were properly designed. Grisez stated that the steering wheels were held in place by a single bolt with a lock washer, inserted from the

underside of the normal steering wheel position, through the bottom of the steering wheel sleeve and threaded into the steering shaft. (Doc. 40-9, at 5). Thus, Schwartz and Grisez disagree as to whether the single bolt through the bottom of the steering wheel sleeve into the steering shaft with a lock washer was adequate to retain the steering wheel onto the steering shaft of the SP48.

Second, Schwartz stated that Crown was responsible for plaintiff's accident because the stock picker was prone to intermittently stopping unexpectedly due to the poorly designed electrical drive system. Schwartz opines that the machine's electrical drive system was defective because it was not sealed sufficiently to prevent infiltration of dirt that could cause intermittent electrical failures. Third, Schwartz opines that the machine's hydraulic system for raising and lowering the lift was defective because it was prone to hydraulic failures that could trap operators in the raised position with no method to lower the lift. He states that a manual release should have been designed into the system and provided to allow the operator to gradually lower the unit to ground level safely. (Doc. 48-1, July 30, 2015 Report of Schwartz).

Crown seeks to exclude Schwartz's expert reports and claims that all of his opinions are not admissible at trial under FRE 702 and FRE 703. Crown states that Schwartz's theories have not been tested and are not based on any reliable predicate, and that his latter two theories do not meet the fit requirement, *i.e.*, they are not scientific knowledge for purposes of this case.

Crown relies upon Federal Rules of Evidence 702 and 703 to support

its present motion. Crown states that the court should exclude the testimony of Schwartz because he is not qualified to offer stock picker design opinions and because his opinions are unreliable under *Daubert*.

Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if:
> (a) the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based upon sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> (d) the expert has reliably applied the principles and methods reliably to the facts of the case.

The Third Circuit has held that Rule 702 provides "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000). "The proponent of the expert testimony bears the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence." Dalton v. McCourt Elec. LLC, 112 Supp.3d 320, 325 (E.D.Pa. 2015) (citing Padillas v. Stork–Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999)).

Fed.R.Evid. 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the

16

opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

The Third Circuit stated in Walker v. Gordon, 46 Fed.Appx. 691, 694 (3d Cir. 2002), "[t]he District Court has broad discretion in determining the admissibility of evidence, and 'considerable leeway' in determining the reliability of particular expert testimony under *Daubert*." (citing *Kumho Tire, 526 U.S. at 152-53*." The *Walker* Court also stated that "*Daubert* requires that, when faced with a proffer of expert testimony, a trial judge determines 'whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.'" Id. (citing *Daubert, 509 U.S. at 592, 113 S.Ct. 2786*). "These gatekeeping requirements have been extended to apply to all expert testimony." *Id.* (citing *Kumho Tire, 526 U.S. at 147*.).

Further, the *Walker* Court, 46 Fed.Appx. at 694, stated:

> In accordance with *Daubert*, trial courts are required to apply a reliability analysis to an expert's opinion; that opinion is "reliable" if it is based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509 U.S. at 590). In other words, the expert must have "good grounds" for his belief. *Id.* at 741-42 (explaining how Rule 702, which governs the use of expert testimony in the federal courts, embodies three distinct substantive restraints on the admission of expert testimony: qualifications, reliability and fit).

The court in *Walker* provided guidance on the role of the trial court with respect to its gatekeeping requirements. The court in *Walker*, 46 Fed.Appx.

17

at 695, explained:

> In performing its gatekeeping function and, in particular, in deciding whether an expert's report meets the reliability factor of a *Daubert* and Rule 702 analysis, the District Court is not to weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein. To the contrary, the role of the District Court is simply to evaluate whether the *methodology* utilized by the expert is reliable, i.e., whether, when correctly employed, that methodology leads to testimony helpful to the trier of fact. *See* Daubert, 509 U.S. at 591-93 (noting that the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" and that the trial court's determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue"). [FN7] Determinations regarding the weight to be accorded, and the sufficiency of, the evidence relied upon by the proffered expert, are within the sole province of the jury. *Cf.* Breidor v. Sears, Roebuck and Co., 722 F.2d 1134, 1138-39 (3d Cir. 1983), ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge.").

An expert need only have "good" grounds for his opinion. The basis might be imperfect to such a degree that the court would find there is some different conclusion that has stronger evidentiary support, but that does not justify exclusion. In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 744 (3d Cir. 1994).

Crown argues that Schwartz is not qualified to render any of his stock picker design opinions and, that none of his opinions are based on methods and procedures of science. Rather, Crown contends Schwartz's opinions are merely based on unsupported speculation and on his subjective beliefs. Also, Crown maintains that Schwartz's proffered testimony is not relevant to this

case. Crown points out that Schwartz has never worked for a company that manufactures or designs material handling equipment, including stock pickers. (Doc. 40-7, at 8). Nor has he ever designed a stock picker or component part for any manufacturer. Also, he has never been personally involved with any design issue concerning stock pickers. Further, Schwartz has not been trained to operate a stock picker and he has not experience in operating one. Schwartz also admitted that he did not inspect the stock picker machine at issue or any Crown stock picker.

Moreover, Schwartz testified that he did not review the governing design standards for stock pickers and that he has never before given stock picker design or safety opinions. Nor was he previously retained to provide opinions on the design of any type of steering wheel fastening system.

Thus, Crown contends that Schwartz's credentials do not give him a basis to offer any opinion as to whether the stock picker had design defects and that he is not qualified to render his opinions.

Schwartz's curriculum vitae, (Doc. 40-9, at 10-13, Doc. 48-4), shows that he is a Pennsylvania, New Jersey, Maryland and Delaware licensed Professional Engineer and that he has been a Mechanical Engineer since 1965. He is presently employed by RAM Technology Services, Inc. Part of his specialities include vehicular crash analysis, automotive engineering, machine guarding, safety engineering, special vehicle design, fleet management, project management, construction and industrial safety, and building design

19

codes. He has received training in commercial vehicle accident reconstruction. On several occasions in the past, he had to direct mechanics how to make repairs and redesigns on material handling equipment such as forklifts and pallet jacks. Further, Schwartz testified that he had familiarity and experience with fastening systems such as the one at issue in this case, and the potentials for failure of the type of fastening system used by Crown in its design of the stock picker. (Doc. 48-3, at 88-89). He also has extensive experience in accident analysis involving a vide variety of vehicles and equipment. He is on the accident reconstruction committee of the National Society of Professional Engineers as well. (Doc. 40-7, at 3-7). The Third Circuit allows "more general qualifications of experts" which "extends to the substantive as well as the formal qualification of experts." Paoli, 35 F.3d at 741. "Thus, an expert can qualify based on a broad range of knowledge, skills, training and experience." David v. Black & Decker (US) Inc., 629 F.Supp.2d 511, 514 (W.D.Pa. 2009). In liberally considering Schwartz's qualifications, as the Third Circuit requires, *see* Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003), Schwartz has the required specialized expertise based on his knowledge, skill and experience, and in particular based on his lengthy experience with special vehicle design, redesigns of material handling equipment, and automotive safety engineering. The court finds that Schwartz's Report and Supplemental Report, (Doc. 40-9, Doc. 40-10), and testimony regarding the stock picker steering wheel

fastening system will assist the jury in understanding the evidence to be presented at trial and in determining facts that will be in issue at trial. Thus, they meet the "fit" requirement. Crown can certainly present testimony of its witnesses and its experts, including Grisez, about industrial standards for stock pickers. An expert, based on his experience, can testify about industry customs and practices but cannot give his opinion as to the legal duties arising from industry custom or whether a party complied with the law. *See* Berckeley Inv. Group, Ltd. V Colkitt, 455 F.3d 195, 218 (3d Cir. 2006). While Crown's witnesses may provide the jury with factual information required to determine the relevant issues concerning the requirements for the design and industry standards of stock pickers, the court finds that Schwartz's testimony will also help the jury in understanding the evidence and in deciding facts regarding the design of the steering wheel. Therefore, Schwartz is qualified, and his stated testimony will assist the jury.

Crown next argues that Schwartz's opinions are not supported by good grounds. Specific opinions require specific knowledge in the field. *See* Calhoun, 350 F.3d at 322. The second requirement pertains to reliability and the expert's opinions must be based on "methods and procedures of science" and he must have "good grounds for his or belief." Paoli, 35 F.3d at 742 (citation omitted). The court considers several factors in determining whether there are "good grounds" for the expert's opinions, including: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been

subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." Id. at 742 n. 8. The court does not have to apply each factor in every case and the list is not exhaustive. Elcock, 233 F.3d at 746.

Crown states that Schwartz's testimony regarding safer alternative designs of the stock picker should be excluded because: he did not test stock picker number 201; he failed to prepare design drawings or prototypes and test his alternative design theories; and he failed to propose specific designs for 2 of his alternatives, *i.e*., he did not develop an alternative electrical drive system that was properly sealed and a hydraulic system that had a manual release valve to lower the lift. Crown contends that since Schwartz did not perform any relevant testing, prototypes, drawings, or prepare specific alternative designs, a jury could not evaluate whether his concepts are feasible and safer alternative designs. Additionally, Crown argues that Schwartz's opinions do not have any reliable support and, that his theories regarding design defects with the steering wheel fastening system, the electrical drive system and the hydraulic system are not supported by the facts of this case. Further, Crown contends that all of Schwartz's opinions

should be excluded because they do not fit the facts of this case.

[T]rial courts should determine whether the expert's conclusion is based on valid reasoning and reliable methodology." Cuffari v. S–B Power Tool Co., 80 Fed.Appx. 749, 751 (3d Cir. 2003). With respect to the stock picker's hydraulic system, the court agrees with Crown, (Doc. 40, at 20-21), that Schwartz's opinion should be excluded since Grisez stated that the SP48 stock picker in this case is equipped with a manual lowering valve located in the power unit chassis. (Doc. 40-8, Grisez Report at 6). There is no evidence to dispute Grisez's assertion. Additionally, Schwartz's opinion regarding the hydraulic system will be excluded because it is irrelevant as he testified that an alleged hydraulic failure had nothing to do with plaintiff's accident. In fact, Schwartz admitted that even if Crown had changed its design regarding the hydraulic system, it would not have prevented plaintiff's accident. (Doc. 40-7 at 10-11, 18). Finally, as Crown points out in its reply brief, (Doc. 51, at 2), since plaintiff did not address its argument that Schwartz's opinion regarding the stock picker's hydraulic system should be excluded, she is deemed as not opposing its motion in this regard.

Schwartz also opines that the stock picker's electrical drive system was defective because it was not properly sealed to prevent infiltration of dirt that could cause intermittent electrical failures. Schwartz's opinion about the design defect with the stock picker's electrical drive system will also be excluded since it is not reliable and does not fit the facts of this case.

Schwartz does not rely upon any evidence in the record which shows that the electrical drive system of stock picker number 201 actually had an accumulation of dust and dirt and, that any such condition caused an electrical failure in the stock picker at the time of plaintiff's accident. (Doc. 40-7 at 11). Schwartz speculates that the stock picker could intermittently fail if its electrical components were exposed to dirt and debris. However, there was no evidence in the record that there was an accumulation of dust and dirt that was found by anyone that could have caused an electrical failure on stock picker number 201. Further, Schwartz testified that he does not know whether the stock picker stopped because of an intermittent electrical failure or because plaintiff removed her foot from the brake pedal. (Doc. 40-7 at 11, 19). He admitted that he was merely relying upon plaintiff's testimony that the stock picker stopped on its own. In fact, the evidence showed that Wal-Mart completed frequent preventative maintenance checks on the stock picker, including cleaning out its electrical drive system with an air blower. There is simply no evidence in the record which indicated that dirt and debris in the stock picker's electrical system interfered with its electrical operation on the day of plaintiff's accident. (Id. at 18-19). It is undisputed that Schwartz did not examine and test stock picker number 201 nor any exemplar, and that Wal-Mart post-accident investigation found that plaintiff's foot slid from the brake pedal when she fell backwards. Indeed, Schwartz himself testified that plaintiff removing her foot from the brake was "a plausible scenario." (Id. at

11). It should be reiterated that to apply the brake on a Crown SP48 stock picker, the operator lifts his or her foot off of the brake pedal. (Doc. 40-8, Grisez Rep. at 3). The court finds there is no evidence to support a question of fact as to how the stock picker stopped as plaintiff suggests exists.

Additionally, as Crown points out, while Schwartz opines that enclosing the electrical system could have alleviated any problems from dirt and debris, he has not presented any specific alternative design to the stock picker's electrical drive system. Nor did he cite to any evidence to show that the stock picker's electrical drive system ever failed due to dust or that it ever accumulated dust and debris to cause it to stop.

"The inquiry into methodology is designed to ensure that an expert's opinions are based upon 'methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief.'" David, 629 F.Supp.2d at 514 (quoting Paoli, 35 F.3d at 742). Schwartz's opinions with respect to the stock picker's hydraulic system and electrical drive system lack good grounds. Plaintiff failed to meet her burden of establishing that Schwartz's stated opinions meet the reliability and fit requirements by a preponderance of the evidence. Thus, Crown's motion to exclude is **GRANTED** with respect to Schwartz's opinions and testimony regarding the stock picker's hydraulic system and electrical drive system. Plaintiff is not permitted to introduce at trial any evidence regarding Schwartz's stated opinions.

Crowns states that Schwartz's opinion regarding the steering wheel fastening system lacks methodology in its formulation and the *ipse dixit* nature of this opinion, *i.e.*, it is made simply because Schwartz himself said that this defect must have caused the steering wheel to fall off, is unreliable and unfit for the jury to hear. Crown contends that the only bases Schwartz offers for his opinion that the design of its steering wheel fastening system utilizing a bolt with a standard lock washer was defective is plaintiff's injury and the reports showing 2 other unspecific instances where a Crown SP48 stock picker steering wheel disconnected from the steering shaft. (Doc. 40-7 at 17-18).

The court will deny Crown's motion with respect to Schwartz's opinion regarding the design defect with steering wheel fastening system. Although Schwartz admitted that his steering wheel fastening system design alternatives utilizing a cotter pin or safety wire are not supported by the engineering and forklift communities, and that he does not know any stock picker that incorporates either of his alternatives into their steering wheel fastening system designs, his opinions are nonetheless sufficiently reliable and meet the fit requirement, *i.e.*, they are based on scientific knowledge and will assist the jury. Schwartz also has good grounds for his opinion explaining that if he was redesigning the steering wheel fastening system on the stock picker, he would probably put in a bolt and lock washer through the steering wheel sleeve into the steering shaft with a nut on either a cotter pin or safety

wire. (Doc. 40-7 at 7).

Schwartz examined the drawings of the stock picker design from the maintenance manual. Schwartz explained that the stock picker had a cotter key that kept the shaft in place so the steering wheel can not turn on the shaft, but that it did not do anything to hold the steering wheel on the shaft. In fact, Schwartz stated that plaintiff may not have noticed any weakness with the steering wheel while she used the stock picker for several hours on the day of the incident until the shaft disengaged from the cotter key. (Id. at 20). Schwartz opined that due to the constant vibration during operation and the frequent reversal of loading on the retaining bolt, a through bolt with safety wire or a through bolt with a cotter pin would have been the safer design for the retaining bolt. He explained that traveling alone in the stock picker would cause vibration especially since the steering wheel was mounted with the through bolt up from the bottom, and that every time you turn the steering wheel one way and the other way, you are reversing the forces on that bolt and gravity is there all the time. Although Schwartz admitted that he did not do any testing or prototypes of his specific design alternatives with respect to either a cotter pin or a safety wire to determine their reliability and how they operate, he stated that these designs have been used for many years on high vibration applications. He also emphasized that it has been documented for years regarding the vibration on a bolt in the inverted position with repeated reversal of force and gravity. (Id. at 13-14, 18). As plaintiff states, (Doc. 48,

at 9), Schwartz testified that you do not typically mount the steering wheel with the through bolt up from the bottom, and that he is unaware of any entity that uses the design employed by Crown for the fastening of a steering wheel system since the design lends itself to the type of failure that occurred in this case. (Doc. 48-3, at 88-89). He pointed out that every time you turn the steering wheel on the stock picker one way and the other way the bolt moves, and that by doing so, you reverse the forces on that bolt and gravity is there all the time.

Further, Schwartz stated that he has seen other uses of the alternative fastening system which he recommends in this case used in other applications where constant vibration is a concern, such as aircrafts, aircraft engines, and automobile wheels and axles. (Id., at 91-92). As such, Schwartz applied generally accepted methods in formulating his alternatives to ensure the bolt would not fall off during operation. While Crown argues that Schwartz did not prove that the vibrations experienced in the other applications where his alternative designs are used are comparable to the vibrations in the stock picker, the court finds that this fact goes to the weight of his opinion and not to its reliability. Thus, based on the above discussion, plaintiff has demonstrated by a preponderance of evidence that Schwartz's opinion regarding the steering wheel fastening system is reliable.

Even though Schwartz did not test his own theory regarding the design defect with Crown's retaining bolt and lock washer steering wheel fastening

system and he did not examine the stock picker, he took a systematic approach and applied the generally accepted scientific method in identifying a potential reason as to why the steering wheel fell off while plaintiff was operating the stock picker. *See* Dalton, 112 F.Supp.3d at 329-30. Schwartz explained the rationale for his alternative designs using a through bolt and safety wire or a through bolt and cotter pin to fasten the steering wheel. As such, the court finds that Schwartz's failure to conduct any tests regarding his alternative designs may have effected the degree of reliability of his opinion, but it does not render his opinion as unreliable. The court finds that this failure to conduct tests by Schwartz goes to the weight of his opinion and not to its reliability. *Id*.

Thus, Crown's motion to exclude is **DENIED** with respect to Schwartz's opinion and testimony regarding the stock picker's steering wheel fastening system.

### B. Crown's Summary Judgment Motion

Crown contends that it is entitled to summary judgment with respect to plaintiff's claims for strict liability and negligence. Mr. English's loss of consortium claim can not proceed without the underlying claims of his wife since it is contingent upon them.

Initially, Crown argues that plaintiff did not establish a failure to warn claim or a manufacturing defect claim. Crown contends that plaintiff has only

offered evidence regarding her design defect claim. While plaintiffs' complaint also included claims for manufacturing defect and failure to warn, the court agrees with Crown that plaintiff offered no evidence to support such claims. Indeed, Schwartz only offers opinions regarding the aforementioned designs of the stock picker. Both parties agree that plaintiff's claims in this case require expert testimony under Pennsylvania law. In fact, in her brief in opposition to Crown's summary judgment motion, (Doc. 49), plaintiff addresses only her claims regarding alleged design defects of the stock picker. Thus, Crown's summary judgment motion is **GRANTED** with respect to plaintiff's strict liability claims for failure to warn and for manufacturing defects contained in Count II. Crown's summary judgment is also **GRANTED** with respect to plaintiff's negligence claims for failure to warn and for negligent manufacturing of the stock picker raised in Count I.

Plaintiff's design defect claim has three components as indicated above, and alleges that the stock picker's steering wheel fastening system, electrical drive system and hydraulic system were defective. As discussed above, Schwartz's opinions regarding the stock picker's hydraulic system and electrical drive system have been **EXCLUDED** and this evidence will not be considered for purposes of Crown's summary judgment motion. Since Schwartz's testimony was plaintiff's sole evidence regarding alleged design defects with the stock picker's electrical drive system and hydraulic system, Crown's summary judgment motion is **GRANTED** with respect to these strict

30

liability claims contained in Count II. Crown's summary judgment is also **GRANTED** with respect to plaintiff's negligence design claims regarding the stock picker's electrical drive system and hydraulic system asserted in Count I.

Plaintiff is proceeding on a theory of strict product liability under the recent Pennsylvania Supreme Court decision in Tincher v. Omega Flex, Inc., 104 A.3d 328 (Pa. 2014), against Crown.[3] Plaintiff's remaining strict liability claim alleges that the stock picker machine had a design defect with its steering wheel fastening system. Since the Pennsylvania Supreme Court in *Tincher* declined to adopt Third Restatement of Torts in the context of design defect cases, plaintiff is proceeding on her design defect strict liability claim pursuant to Section 402A of the Second Restatement of Torts.[4] Also, "the Pennsylvania Supreme Court just recently clarified in *Tincher v. Omega Flex, Inc*. that, under Pennsylvania law, Section 402A governs only strict liability

---

[3]Jurisdiction of this court is based on diversity pursuant to 28 U.S.C. §1332(a). As such, the substantive law of Pennsylvania law is utilized. *See* Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817 (1938); *see also* Guaranty Trust Co. v. York, 326 U.S. 99, 108, 65 S.Ct. 1464 (1945).

[4]In Tincher, 104 A.3d at 399, the PA. Supreme Court overruled Azzarello v. Black Brothers Co., Inc., 480 Pa. 547, 391 A.2d 1020 (Pa. 1978), but "declined the invitation to fill the void by simply 'adopting' the Third Restatement [of Torts] formulation" with respect to "the appropriate standard of proof of a [design defect] strict liability claim in Pennsylvania." Thus, "Pennsylvania remains a Second Restatement jurisdiction" in design cases and a strict liability cause of action sounds in tort. Id. at 399-400.

claims, and that common law negligence claims are subject to a different standard and analysis." Schwartz v. Abex Corp., 106 F.Supp.3d 626, 635 (E.D.Pa. 2015) (citing Tincher, 104 A.3d at 336, 345, 358, 381-83, 384).

The remaining legal issues for trial are whether the stock picker's steering wheel fastening system was defectively designed and unsafe, and whether the stock picker was in a defective condition when it left Crown's control. "To prevail on a strict liability claim under Pennsylvania law, a plaintiff must prove that (1) the product was defective; (2) the defect was the proximate cause of the plaintiff's injury; and (3) the defect existed at the time the product left the manufacturer's control." Dalton, 112 F.Supp.3d at 327 (citing Barnish v. KWI Bldg. Co., 602 Pa. 402, 980 A.2d 535, 541 (2009)).

In Tincher, 104 A.3d at 383, the court stated that the non-delegable duty in a strict liability case is "a person or entity engaged in the business of selling a product has a duty to make and/or market the product—which 'is expected to and does reach the user or consumer without substantial change in the condition in which it is sold'—free from 'a defective condition unreasonably dangerous to the consumer or [the consumer's] property.'" (citing Restatement (2D) of Torts §402A(1)). "To demonstrate a breach of duty in a strict liability matter, a plaintiff must prove that a seller (manufacturer or distributor) placed on the market a product in a 'defective condition.'" Tincher, 104 A.3d at 384. Additionally, "in Pennsylvania, the cause of action in strict products liability requires proof, in the alternative, either of the ordinary

consumer's expectations or of the risk-utility of a product." Id. at 401. The alternative test standard of proof is a "composite", *i.e*., a standard of proof which states the consumer expectations test and the risk-utility test in the alternative. Id. at 402. "[T]he strict liability cause of action theoretically permits compensation where harm results from risks that are known or foreseeable ... and also where harm results from risks unknowable at the time of manufacture or sale ...." Id. at 404-05. Plaintiff's strict liability claims in the present case are premised upon both a "consumer expectations" and a "risk-utility" theory. "[W]hen a plaintiff proceeds on a theory that implicates a risk-utility calculus, proof of risks and utilities are part of the burden to prove that the harm suffered was due to the defective condition of the product." Id. at 407. "Section 402A makes sellers liable for harm caused to consumers by unreasonably dangerous products, even if the seller exercised reasonable care[.]" Covell v. Bell Sports, Inc., 651 F.3d 357, 360 (3d Cir. 2011).

Crown's summary judgment motion is based only on its contention that plaintiff failed to offer any admissible evidence in the nature of expert testimony to support her design defect strict liability claims. As mentioned, plaintiffs commissioned an expert report from Schwartz, a professional engineer. In his report, Schwartz opines, in part, that Crown's stock picker's steering wheel fastening system had design flaws which caused the steering wheel to fall of during operation by the plaintiff which lead to her injuries. As discussed, Schwartz's testimony regarding the design defect of the steering

wheel fastening system will be allowed at trial. Thus, Crown's summary judgment is **DENIED** with respect to plaintiff's negligence design claim raised in Count I, and her strict liability design claim asserted in Count II, regarding only the stock picker's steering wheel fastening system since plaintiff has presented admissible expert testimony establishing that the stock picker was defectively designed in this respect.

Mr. English's derivative loss of consortium claim, Count III, will also proceed to trial and Crown's summary judgment is **DENIED** with respect to this claim.

An appropriate order will issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: February 16, 2016**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-0978-01.wpd

34